Argued May 8, reversed June 26, petition for rehearing denied
August 5, second petition for rehearing denied
September 3, 1975

VAUGHN, *Respondent, v.* G. D. SEARLE & CO.,
*Appellant.*
536 P2d 1247

*William P. Richmond,* of Sidley & Austin, Chicago, Illinois, argued the cause for appellant. With him on the briefs was Hugh B. Collins, of Collins, Ferris & Velure, Medford.

*Roger G. Tilbury,* Portland, argued the cause for respondent. With him on the brief was Bruce J. Rothman, Portland.

HOWELL, J.

This is a negligence action in which the plaintiff, Anita Vaughn, seeks damages from the defendant, G. D. Searle & Company, a manufacturer of oral contraceptives, for injuries suffered as the result of a cerebral vascular accident (stroke) allegedly caused by the ingestion of the defendant's drug, Ovulen. Plaintiff alleges that the defendant was negligent in failing to provide adequate warnings to the medical profession concerning the dangerous propensities of its product. The jury returned a verdict for the plaintiff, and the defendant appeals.

Defendant raises numerous assignments of error. However, we need only consider the questions raised by defendant's first assignment—that the trial court erred in denying defendant's motion for a directed verdict. This motion was based in part upon the contention that plaintiff failed to present any evidence with regard to the element of causation.

In *McEwen v. Ortho Pharmaceutical,* 270 Or 375, 528 P2d 522 (1974), this court discussed in detail the duty of a drug manufacturer to provide timely and adequate warnings to the medical profession with regard to the dangerous propensities which the manufacturer knows, or has reason to know, are inherent in the use of its drug. It would serve no useful purpose to repeat that discussion in the instant case. Suffice it to say

that the manufacturer's duty to warn extends to both the prescribing and treating physician, and the defendant manufacturer is directly liable to the patient for damages suffered as a result of the breach of such duty. A duty exists even though, as in the instant case, the danger threatens only a statistically small percentage of the users of the drug. *McEwen v. Ortho Pharmaceutical,* supra at 385-390.

With regard to causation, we noted in *McEwen:*

"The final element of plaintiff's cause of action is proof that each defendant's failure to warn was, in fact, a substantial factor in producing the damage complained of. Within the broad question of causation two sub-issues are implicit. First, we must determine whether each defendant's negligence could be found to be a substantial cause of plaintiff's ingestion of the oral contraceptive manufactured by that defendant. If so, we must then decide whether plaintiff's ingestion of that drug could be found to be a substantial factor in producing her * * * injuries." 270 Or at 407.

We consider the evidence in the light most favorable to plaintiff.[1]

When plaintiff commenced taking defendant's oral contraceptives on February 4, 1969, she was 22 years old and in good health. On that date she went to the clinic of the Planned Parenthoood Association of Oregon, Inc., in Portland and requested oral contraceptives. Dr. Clarice Nordlum examined plaintiff and,

---

[1] In considering the propriety of the court's denial of the motion,

"the plaintiff is entitled to the benefit of every reasonable inference which may be drawn from the evidence; such inferences may be drawn from defendant's as well as plaintiff's evidence. * * * Moreover, all evidence must be interpreted in the light most favorable to the plaintiff, and it is beyond our power to weigh or evaluate conflicting evidence. * * *."

McEwen v. Ortho Pharmaceutical, 270 Or 375, 528 P2d 522 (1974).

finding no contraindications[2] in plaintiff's medical history or her examination, prescribed Ovulen-21.

On July 23, 1970, plaintiff returned to the Planned Parenthood Clinic for a follow-up prescription. She reported no complaints with regard to the pill, and Dr. John McCall continued her on defendant's drug.[3]

Plaintiff testified that in August or early September, 1970, she experienced some dizziness and nausea. A few weeks later she had a similar occurrence. In September or October, 1970, plaintiff noticed a darkening of the periphery around her eyes. Prior to this time plaintiff had never been afflicted with either visual problems or unexplained dizziness and nausea.

On October 12, 1970, plaintiff saw Dr. Corrine Chamberlin for a physical examination. She complained of heart palpitations, although she had had no symptoms of heart palpitations for the past month and showed no such symptoms during the examination. Plaintiff reported to Dr. Chamberlin that she was on the pill and that she was very happy with it. Dr. Chamberlin examined the plaintiff but did not do a neurological examination because "there was no headache, no eye symptoms, nothing to indicate any further examination." Based on the medical history which the plaintiff gave the doctor and the doctor's examination, the doctor felt that the plaintiff was in good health. She felt that plaintiff's heart palpitations were functional, meaning that there was nothing organically abnormal about plaintiff's heart.

[2] A "contraindication" is "any special symptom or circumstance that renders the use of a remedy or the carrying out of a procedure inadvisable." Stedman's Medical Dictionary 283 (3rd Unabr. Lawyers ed 1972).

[3] Actually, plaintiff's prescription was changed from Ovulen-21 to Ovulen-28. They are the same except that Ovulen-28 contains seven placebos so that the patient takes a pill every day.

Plaintiff had another attack of dizziness and nausea, and on October 30, 1970, returned to Dr. Chamberlin. She complained to the doctor that she had been vomiting and dizzy for two days and had had some cold sweats, but was feeling better at the time of the examination. The doctor conducted another physical examination, including a check of blood pressure, pulse and temperature, and an examination of her eyes, heart, lungs and abdomen. The examination was negative, and the doctor diagnosed plaintiff's ailment as a viral syndrome. The doctor testified that, at that time, such syndromes were "almost epidemic in character" and dizziness and nausea were symptoms. The doctor did not conduct a neurological examination or check the blood vessels in plaintiff's eyes. The doctor gave the plaintiff medication to relieve her dizziness, nausea and constipation.

On the evening of November 6, 1970, while plaintiff was at home, she again became dizzy and nauseated. She went to the emergency room of Gresham Hospital, where she was examined by Dr. Robert Hakala. She complained of dizziness and nausea, saying she "felt rocky on her feet." She stated that she had had a similar episode the prior week. The doctor's examination included a check of plaintiff's blood pressure and pulse; an examination of her head, neck and chest; and a neurological examination. The examination failed to reveal any abnormalities. He diagnosed the source of her dizziness and nausea as labrynthitis, an inflammation of the inner ear mechanism. He gave plaintiff a sedative and advised her to return to the emergency room or to consult her family doctor if the symptoms persisted.

On November 16, 1970, plaintiff became very dizzy and nauseated. Her left arm and leg "gave out" and she was unable to support herself with her left

side. Plaintiff was taken to the clinic of Dr. Richard Harris, who diagnosed her condition as a stroke. He felt that her condition might have been caused by use of defendant's oral contraceptives and immediately withdrew the plaintiff from Ovulen.

At trial, plaintiff contended that the warning which defendant gave to plaintiff's prescribing and treating physicians was insufficient, because it failed to adequately apprise those doctors that the defendant's oral contraceptive could cause a cerebral vascular accident in the user. Plaintiff also presented evidence that she did, in fact, suffer a cerebral vascular accident and that it was the result of her ingestion of Ovulen.

■ However, as previously mentioned, the primary question in this case is one of causation, that is, whether the defendant's failure to warn was a substantial cause of plaintiff's injuries. The relevant inquiry on that issue is (1) whether plaintiff had premonitory symptoms of a stroke prior to or at the time she saw her treating physicians, and (2) whether such symptoms were made known to those treating doctors. Both parties agree that none of plaintiff's prescribing or treating physicians were negligent in the treatment of plaintiff.[4]

■ We find that plaintiff has offered no evidence, either direct or indirect, that she ever advised her treating physicians of symptoms which would have alerted them to the possibility of a stroke. Without such knowledge there was no way the physician could have related any warning (that there is a cause-and-effect relationship between the ingestion of the drug

[4] Had the physicians been negligent in failing to detect symptoms of a stroke, which a nonnegligent physician would have detected, such negligence would not relieve the drug manufacturer from liability for its failure to warn. McEwen v. Ortho Pharmaceutical, supra note 1 at 407, n. 30.

and a stroke) to plaintiff's particular case. Thus, there was no evidence that even a properly warned physician would have treated plaintiff differently or removed her from defendant's oral contraceptive prior to her stroke.

There was evidence that the premonitory symptoms of a stroke are greatly elevated blood pressure, severe headaches, weakness or numbness of an arm or leg, spots before the eyes, nausea if associated with a headache, and dizziness if associated with a headache.[5] While the plaintiff testified that she had had severe headaches, spots before her eyes, nausea and dizziness prior to the time she saw Dr. Hakala, the last treating physician before her stroke, there is no evidence that she related these symptoms, other than dizziness and nausea, to the doctors.[6]

Dr. Chamberlin, the first treating physician plaintiff saw after taking the pill and after first noticing the nausea and dizziness, testified that plaintiff complained at her examination on October 12 of only heart palpitations. After an examination the doctor found her blood pressure and temperature to be normal and that she had no eye symptoms and had no headaches.

Dr. Chamberlin testified that she saw plaintiff again 18 days later. She stated that plaintiff com-

---

[5] The symptoms of cerebral vascular accident were also reported as "dizziness, vomiting, headache, scintillating scotomata" ["vague blindness in both eyes; * * * flickering lights surrounding it in both eyes"]; "headache, visual symptoms, or other signs of transient cerebro-vascular insufficiency" (92 Radiology 231, 238 (Feb. 1969)); "young women suffering from stroke while using the oral contraceptives almost always have some warning, usually significant headache, prior to the onset of the paretic event." Second Report on Oral Contraceptives, Advisory Comm. on Obstetrics and Gynecology, Food and Drug Adm. (Aug. 1, 1969).

[6] As noted above, Dr. Chamberlin testified that viral syndromes, accompanied by dizziness and nausea, were "almost epidemic in character" at the time she saw plaintiff.

plained of some vomiting and dizziness and cold sweats, but did not complain of headaches. Again her blood pressure and pulse were normal. An examination of her eyes showed negative results.

Dr. Hakala examined plaintiff on November 6, 1970. He said she complained of dizziness and nausea and felt "rocky on her feet." An examination showed a normal blood pressure and pulse. Apparently no mention was made of headaches, and plaintiff did not testify that she reported headaches to Dr. Hakala—only dizziness and nausea.

Even if we accept only nausea or dizziness if associated with headache as a sufficient symptom, it is clear from the testimony of Drs. Chamberlin and Hakala that at no time did plaintiff report any premonitory symptoms of a cerebral vascular accident. On the contrary, Dr. Chamberlin testified:

"Q  And at either time you saw the patient, she did not have any premonitory symptoms of CVA [cerebral vascular accident], did she?

"A  No, she did not."

Again, if we accept nausea or dizziness if accompanied by headache as premonitory symptoms of a cerebral vascular accident sufficient to alert a physician, the evidence fails from the plaintiff's own testimony. Assuming a question of fact could have been developed if plaintiff, contrary to the testimony of the physicians, had testified that she reported severe headaches to the physicians, plaintiff did not so testify. She stated:

"Q  Now, did you report this [headaches] to Dr. Chamberlin?

"A  I don't remember if I did. I can't determine. * * *."

Plaintiff supported the testimony of Dr. Chamberlin and admitted that she had complained of heart

palpitations the first time she saw Dr. Chamberlin. She also stated, "She advised me to come in if I had any more heart palpitations or blurriness." There was no direct testimony from plaintiff that she complained to Dr. Chamberlin of blurriness of vision, and Dr. Chamberlin stated that plaintiff had no eye symptoms.

In summary, plaintiff's doctors had no information which would lead them to believe that plaintiff was about to suffer a cerebral vascular accident.[7] Thus, even if the doctors had been adequately apprised of the cause-and-effect relationship between cerebral vascular accident and the ingestion of defendant's drug Ovulen, they would have had no way of relating that information to plaintiff.

We conclude that there was no evidence that any failure to warn plaintiff's physicians was a substantial factor in producing plaintiff's injuries and that defendant's motion for a directed verdict should have been granted.

Reversed.

---

[7] The evidence in the instant case, when contrasted with that presented in *McEwen,* clearly shows the inadequacy of plaintiff's case. In *McEwen* this court upheld a verdict for plaintiff against the manufacturers of oral contraceptives for failure to warn treating physicians that the ingestion of defendants' drugs might cause eye injury. There, plaintiff reported to her treating physicians that she was losing the sight in her right eye. Had her doctors been warned of the causal connection between her eye symptoms and the drug, they could have taken her off the drug and begun corrective measures.