Doreen CHAMBERS, Plaintiff,

v.

G. D. SEARLE & CO., Defendant.

Civ. No. 73–1027–H.

United States District Court,
D. Maryland.

Dec. 11, 1975.

six days of trial, one of plaintiff's medical witnesses became ill and could not continue. However, the direct examination of such witness had been almost completed. The Court therefore permitted plaintiff to proffer the small portion of this witness' remaining testimony.

The defendant then filed a motion for a directed verdict and submitted a brief in support of such motion. Extensive argument was heard and the Court has also had the benefit of lengthy pretrial briefs filed by the parties.

In a motion such as the present one, the Court looks at the evidence in a light most favorable to the plaintiff. The determination to be made is whether such evidence would permit the case to be submitted to the jury on any one or more of the theories of liability relied upon by the plaintiff. In this case, plaintiff claims that she is entitled to recover damages on the following four theories of liability: (1) fraud; (2) implied warranty; (3) strict liability; and (4) negligence. This Court has previously ruled that District of Columbia law is to be applied.

Little time need be spent in discussing these first three theories of liability which have been advanced. To succeed on a cause of action based on allegations of fraud, a plaintiff must prove (1) a false representation of material fact made by the defendant; (2) knowledge or belief on the part of the defendant that the representation was false; and (3) an intention to induce the plaintiff to act or refrain from acting in reliance upon the misrepresentation. On the record here, this Court concludes as a matter of law that fraud has not been proven. Proof has not been sufficient to establish any of these necessary elements.

Similarly, plaintiff would not be entitled to proceed in this case on a theory of breach of implied warranty. Plaintiff relies on 28 D.C.Code, Section 2–314 (relating to an implied warranty of merchantability) and 28 D.C.Code, Section 2–315 (relating to

Alan M. Perlman and Stylianos J. Gratsias, Washington, D. C., for plaintiff.

J. Joseph Barse, Washington, D. C., and William P. Richmond, Chicago, Ill., for defendant.

## MEMORANDUM DECISION

HARVEY, District Judge:

In this products liability case, the plaintiff is seeking damages from the defendant, G. D. Searle & Co., a manufacturer of oral contraceptives, for injuries sustained by the plaintiff as the result of a stroke which she alleges was caused by taking the defendant's drug, Enovid-E. After approximately

an implied warranty of fitness for a particular purpose). But there has been no evidence to show that the drug in question contained any foreign ingredients, substances or other impurities that rendered it inherently dangerous or unfit for human consumption. Furthermore, the evidence here indicates that the plaintiff was suffering from hypertension when her doctor prescribed this drug.

■ In actions for breach of warranty to recover damages for injury resulting from the use of the product, there is generally no liability upon a seller where the buyer has been unusually susceptible to injury from the product. *See Whittington v. Eli Lilly & Co.,* 333 F.Supp. 98 (S.D.W.Va.1971). A manufacturer cannot be required, under a theory of breach of implied warranty, to insure against the susceptibility of a particular individual. Its duty is to reasonably guard against probabilities, not possibilities. Plaintiff's reliance on warranty cases involving the polio vaccine and the drug Quadrigen is misplaced. See, *e. g., Tinnerholm v. Parke Davis & Co.,* 411 F.2d 48 (2d Cir. 1969) and other cases cited there. Those cases involved situations in which a foreign element or impurity had been included in the drug which should not have been there, and the injury was caused by the defective product.

■ Furthermore, strict liability is not a viable theory in this case. The strict liability doctrine is set forth in Section 402A of the *Restatement of Torts,* 2d. Even assuming that the District of Columbia courts would apply the theory of strict liability to a products liability case involving a drug (and no case has been cited to the Court in which this has been done), the facts here show that the plaintiff could not recover under such a theory. In the first place, Enovid-E has not been shown by the proof to be unreasonably dangerous to the user or consumer. *See* in this regard, Comments (*l*) and (j) of Section 402A. Secondly and more significantly, Comment (k) of Section 402A indicates that insofar as a new drug such as Enovid-E is concerned, a theory of strict liability is essentially the same as a theory of negligence insofar as the question of furnishing warnings is concerned, and that subject will be discussed more fully hereinafter. Indeed, Comment (k) is pertinent in this case both as to plaintiff's claim based on strict liability and to plaintiff's claim based on negligence. Comment (k) reads as follows:

*Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Oral contraceptives are just such products. They are useful and desirable products, now taken by some 10 million persons. But there are attendant risks, and as long as proper warnings are given, the manufacturer cannot be held responsible for an illness such as resulted here.

The authorities cited by plaintiff in support of her argument that strict liability applies here are not pertinent. While there may be a distinction drawn between a negligent failure to warn and the warning requirements for strict liability insofar as other products are concerned, Comment (k) itself indicates that where new drugs, sold only under the prescription of a physician, are involved, the standard is essentially the same. Therefore, Section 402A provides no separate grounds for recovery by the plaintiff.

The principal question presented by the pending motion is whether the plaintiff has produced enough evidence in support of her claim that the defendant was negligent and provided insufficient warnings of the risk of harm from the use of its product, for this issue to be presented to the jury. The standard of negligence in a case of this sort is somewhat different from that presented in the ordinary negligence case. First of all, this case concerns a prescription drug which is regulated by federal law. *See* 21 U.S.C. § 353(b)(1)(C). Thus, the drug can be used only under the professional supervision of a doctor licensed by law to administer the drug. Accordingly, it is quite clear that the warning which must be examined here is that given to the physician and not that given to the user. *See Sterling Drug, Inc. v. Cornish,* 370 F.2d 82 (8th Cir. 1966). As the Eighth Circuit said in that case, "the purchaser's doctor is a learned intermediary between the purchaser and the manufacturer." Other cases have termed the doctor an intervening party who is required to exercise his own independent judgment on the basis of the technical information furnished. *See Carmichael v. Reitz,* 17 Cal.App.3d 958, 95 Cal.Rptr. 381 (1971).

A drug company is not an insurer with respect to the product with which it deals. *O'Hare v. Merck & Company,* 381 F.2d 286, 291 (8th Cir. 1967). As the Eighth Circuit said in the *O'Hare* case, at page 291:

It [the drug company] has the duty to exercise ordinary and reasonable care not to expose the potential consumer to an unreasonable risk of harm from the use of its products. The failure to meet this standard of due care in light of all the attendant circumstances will constitute negligence and subject the manufacturer to liability for the resulting consequences. The fact that the consumer's injuries were proximately caused by the manufacturer's product does not in and of itself constitute a sufficient basis upon which to predicate the manufacturer's liability.

This rule is recognized in the District of Columbia. *See Stottlemire v. Cawood,* 213 F.Supp. 897, 899 (D.D.C.1963), a case in which the Court directed a verdict in favor of the drug manufacturer because the warnings given were sufficient.

Another principle that must be borne in mind in cases of this sort is that the manufacturer's duty to warn must be measured by the information available on the date when the drug was prescribed and used. Dates are thus vitally important as there is no duty to warn of unknown or unforeseeable risks, and the question is whether the risk was knowable or reasonably foreseeable at the time when the plaintiff was still taking the drug. *Basko v. Sterling Drug, Inc.,* 416 F.2d 417, 426 (2d Cir. 1969); *O'Hare v. Merck & Company, supra* at 291; *Gover v. Revlon, Inc.,* 317 F.2d 47, 51 (4th Cir. 1963). This principle is an important one in this case, since much of the evidence presented related to medical and scientific findings and conclusions after July 31, 1970, when plaintiff became ill.

Essentially, the questions presented under this motion insofar as plaintiff's negligence claim is concerned are two: (1) whether as a matter of law the written warnings given the treating physician, Dr. Morse, by defendant were adequate in view of the medical and scientific knowledge available at the time (and it has been

agreed that the cut-off date was July 31, 1970 when plaintiff first became ill); and (2) whether, even if these warnings were inadequate, proper warnings would have resulted in a decision by the doctor that the drug should not have been prescribed for this particular individual, thus avoiding plaintiff's stroke. To prevail on this motion, defendant needs to convince the Court only as to one of these issues. The first, of course, relates to negligence and the second, to proximate causation.

After a careful review of the briefs, exhibits and my trial notes, I am satisfied that both of these questions should be decided in favor of the defendant, and that accordingly defendant's motion for a directed verdict should be granted.

We start with the fact that in this case, unlike many others cited to the Court, the plaintiff called as her witness (by way of deposition) and relied on the testimony of the prescribing doctor, Dr. Morse. Dr. Morse was a general practitioner and had taught pharmacology many years earlier before Mrs. Chambers came to see him. He had prescribed Enovid-E for other patients before prescribing it for the plaintiff. He was quite familiar with the literature describing the use of Enovid-E and precautions against such use, having read letters, package inserts, pamphlets, advertisements, circulars and other literature put out by the defendant concerning this product. He had seen this material before November 1968, when Mrs. Chambers first came to him. However, Dr. Morse did not recall talking to salesmen about the product and did not remember any such salesmen promoting the product or advising him of details as to its use. Thus, this case presents no issue on the question of overpromotion, as Dr. Morse did not rely on anything said to him by salesmen, and it is agreed that the advertising which he did see is essentially the same as the package inserts.

Dr. Morse indicated from his testimony that he was quite familiar with the contraindications and precautions listed in the material furnished by defendant. Thus, it appears that he was aware of the facts which were the subject of the warnings. I would note that a "contraindication" is any special symptom or circumstance that renders the use of a remedy inadvisable. (See Stedman's Medical Dictionary, 283. Lawyer's Ed. 1972).

Dr. Morse knew that thromboembolic diseases were contraindicated, and that one of the precautions was that Enovid-E should not be prescribed if the patient had cardiovascular disease. He listed hypertension as another precaution, but said that there was no definite proof of this. He testified that from what he knew today (at the time he was testifying), Mrs. Chambers had a history of hypertension. However, he said that on the basis of medical knowledge at the time he was treating her, what she had was not considered hypertension by him.

Thus, unlike many of the cases cited by the plaintiff, we have in this case a full record of what warnings the prescribing physician saw and also what he knew at the time he prescribed Enovid-E for the plaintiff on the several different occasions that he told her to use or to continue to use the drug. This case, therefore, does not involve a situation wherein facts were brought to the attention of the doctor after the prescription which would require discontinuance of the drug. Dr. Morse had the same information at the time he first prescribed Enovid-E as he did at the later times. This, then, is not a case like some of those cited by the plaintiff concerning warnings as to discontinuance of the drug if manifestations of particular disorders came to light.

What we have, then, is the question whether the drug should have been prescribed at the outset, on the basis of the plaintiff's pre-existing condition as understood by the doctor and on the basis of warnings supplied by the drug company concerning the attendant risks. Plaintiff's proof has not shown either that the warnings given were inadequate or that in the face of proper warnings the doctor would not have prescribed the drug.

What essentially defeats plaintiff's claim insofar as the issue of the adequacy of the warnings is concerned is that two of

her principal expert witnesses, Dr. Morton and Dr. Pilgeram, testified that the warnings contained in the package inserts were adequate or that the statements contained therein were a fair representation of the medical and scientific knowledge available at the time the drug was taken by the plaintiff. Dr. Morton was a distinguished epidemiologist, who currently teaches the subject and who had also been a practicing obstetrician and gynecologist. Called by the plaintiff as one of her principal witnesses, he showed that he was thoroughly familiar with all the various studies which had reviewed the cause and effect relationship between oral contraceptives and thromboembolic disorders, including the British studies which were published in 1968 and Dr. Sartwell's American studies published in 1969. Dr. Morton found the package inserts to be "very fair" statements of the medical and scientific knowledge known at the time they were prepared and circulated.

Moreover, Dr. Pilgeram, another expert called by plaintiff, who was a biochemist and who did some laboratory studies on the subject of clotting in 1962 for the defendant, testified essentially to the same effect as did Dr. Morton. Since 1970, Dr. Pilgeram's experiments and studies have led him to conclude that there is a direct cause and effect relationship between oral contraceptives and thromboembolic disorders. However, he testified that this was not known in 1970 because all the data was not then in and there was no definite scientific showing at the time of a cause and effect relationship, and because new techniques to measure these clotting effects had not then been developed.

Plaintiff is left on this issue to rely solely on the testimony of Dr. McCleery. In the spring of 1968, Dr. McCleery was employed by the Food & Drug Administration. He was a member of a team which devised a new package insert in May of 1968 for oral contraceptives in view of the new information on the subject that came to light in that year. The draft that he favored contained stronger language than that finally adopted by the FDA and which was later included by the defendant in the literature sent out to accompany Enovid-E.

But the evidence shows that Dr. McCleery was merely one of a team of five FDA representatives working on this project. The other four disagreed with his views. More significantly, an all-day meeting was held on May 8, 1968 with FDA officials, representatives of the drug companies and members of the Special Advisory Committee in attendance. All the British studies were available for this group, as were the 1962 experiments of Dr. Pilgeram. Dr. Sartwell and other medical experts were members of the Advisory Committee. As a result of this all-day meeting and on the basis of all the information that the group had in its possession, final language was adopted which was included in the 1968 new labelling requirements and which was then incorporated word for word in defendant's package inserts and other literature. Of the many persons present at the meeting on May 8, 1968, Dr. McCleery was the only dissenter, insofar as the final language adopted was concerned.

Plaintiff argues that on the basis of Dr. McCleery's views alone she is entitled to have the negligence issue presented to the jury. There might be some validity to this argument if the ultimate issue here was whether Dr. McCleery's views or those of all the others were the correct ones. But that is not the question presented. The question here is whether defendant exercised ordinary and reasonable care in incorporating in its written materials the language finally approved by this working group of scientists and others on May 8, 1968. Certainly, it could hardly be termed negligence for defendant to reject the views of the lone dissenter and accept instead the work product of everyone else, this being a distinguished and experienced group which had all the relevant scientific and medical data before it at the time.

It is true, as plaintiff points out, that approval by the FDA of the language involved is not necessarily conclusive on the question of the adequacy of the warnings. But here there was much more. The Advis-

ory Committee included one of the outstanding experts in the field, Dr. Sartwell. All known data on the subject of the relationship of oral contraceptives and thromboembolic disorders was reviewed by the Advisory Committee as well as by FDA officials. There was no other information available to defendant indicating greater risks or dangers than what was before the group which met on May 8, 1968. Under these circumstances, it was entirely reasonable for defendant to rely on warnings approved by the entire group, even though there was not complete unanimity as a result of the views expressed by the lone dissenter, Dr. McCleery.

In any event, a close look at the draft for oral contraceptive labelling favored by Dr. McCleery indicates that the changes in language he advocated could hardly have been expected to have caused Dr. Morse not to prescribe the drug. At page 2 (this being Plaintiff's Exhibit 386), the physician is directed to be alert for the earliest manifestations of cerebrovascular disorders and discontinue the drug immediately. But there were none in Mrs. Chambers' case. Dr. McCleery's language further states (at page 5) that although evidence is suggestive of causation, a cause and effect relationship has been neither confirmed nor refuted for cerebrovascular accidents. Dr. Morse's testimony indicates that this was essentially his understanding of the relationship in any event.

For these reasons, this Court concludes that as a matter of law, the information provided by defendant in the package inserts and other written materials distributed did contain adequate warnings of the possible adverse side effects of Enovid-E, as of the time plaintiff was taking this drug. Thus, the issue of negligence will not be submitted to the jury. The same conclusion was reached by Judge Fullam in the case of *Magill v. G. D. Searle & Company*, Civil No. 72–1118 (E.D.Pa. May 15, 1975), of course, on a different record from what we have here.

But there is another reason why this issue should be decided in defendant's favor as a matter of law, namely because plaintiff has not furnished sufficient proof of causation. There is no evidence here that Dr. Morse was in possession of information which would have alerted him to the possibility of plaintiff suffering a stroke, even had he been given warnings of a direct cause-and-effect relationship. Indeed, Dr. Morse testified that at the time he first examined the plaintiff, he had no proof that she even had hypertension, merely that she had high blood pressure, although under medical knowledge available to him today, he is now satisfied that she did suffer from hypertension at the time.

Perhaps Dr. Morse should have known or should have found out more about his patient's condition and family history. Plaintiff has claimed in the pleadings, in this and the other actions, that Dr. Morse was negligent, and, following lengthy discovery proceedings in this litigation, her suit against him has been settled. But it is not necessary for a decision on the pending motion to find that Dr. Morse was negligent or not in treating the plaintiff as he did. What is essential here is to ascertain what the undisputed evidence shows he knew at the time and what his medical conclusion was on the basis of the facts he knew. The evidence here shows that as a result of what he knew and the conclusions he drew from what he knew, it would have made no difference if the warnings were in the form which plaintiff contends would be adequate.

This point was illustrated in the recent case of *Vaughn v. G. D. Searle & Co.*, 536 P.2d 1247 (S.C.Or. June 26, 1975), where the Court said the following, at pages 1249–1250:

We find that plaintiff has offered no evidence, either direct or indirect, that she ever advised her treating physicians of symptoms which would have alerted them to the possibility of a stroke. Without such knowledge there was no way the physician could have related any warning (that there is a cause-and-effect relationship between the ingestion of the drug and a stroke) to plaintiff's particular case. Thus, there was no evidence that

even a properly warned physician would have treated plaintiff differently or removed her from defendant's oral contraceptive prior to her stroke.

The *Vaughn* case is significant because, like this case, the prescribing physician testified. The *Vaughn* case should be contrasted with an earlier case of the same court, the Supreme Court of Oregon, namely *McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522 (1974), in which the same court upheld a judgment against a drug company because of inadequate warnings and in which the prescribing physicians did not testify.

So therefore, I would also rule that even assuming the warnings were inadequate, the plaintiff has not proved, in view of the testimony of Dr. Morse here, that any such inadequacy was the proximate cause of her illness.

Although the point was not argued or pressed by plaintiff, I would further note from the Pretrial Order that plaintiff is claiming negligence in testing the product. The only evidence in plaintiff's favor in this regard is the testimony of Dr. Pilgeram, who at the time he was doing the studies for defendant in 1962 was, in his own words, a young, unestablished investigator. The evidence here does not show that had he continued his tests he would have reached the conclusions he now has before July 1970. There was a breakthrough in medical knowledge that occurred in recent years which permitted him to complete his studies and reach his ultimate conclusion. It would therefore be mere speculation to assume that this would have occurred before July 1970 had he continued his work in 1962 and 1963. Thus, I find as a matter of law that plaintiff also could not prevail on that theory of negligence.

For all these reasons, defendant's motion for a directed verdict will be granted.