149 T.C. No. 2

UNITED STATES TAX COURT

BOB GREGORY AND KAY GREGORY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JAMES W. GREGORY, JR. AND JANET E. GREGORY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17198-13, 17210-13.[1]          Filed July 11, 2017.

Ps own C, an S corporation that operates a landfill and uses the cash method of accounting for tax purposes. C is legally required to pay reclamation and closing costs if and when it closes the landfill. C currently deducted its estimated clean-up costs under I.R.C. section 468. R contends that I.R.C. section 468 applies only to accrual-method taxpayers.

<u>Held</u>: The term "taxpayer" in I.R.C. section 468 includes cash-method taxpayers and is not limited to accrual-method taxpayers. I.R.C. sec. 468(a).

_____

[1] We consolidated docket numbers 17198-13 and 17210-13 for trial, briefing, and opinion.

Held, further, cash-method taxpayers must make an I.R.C. section 468 election to currently deduct estimated reclamation, closure, and post-closure costs before the costs are paid. C did make such an election, and it may therefore currently deduct its estimated reclamation and closing costs.

Gregg R. Kosterlitzky and William M. Gerhardt III, for petitioners.

Roberta L. Shumway and Sheila R. Pattison, for respondent.

OPINION

HOLMES, Judge: In 1988 Bob and Kay Gregory incorporated their landfill business, Texas Disposal Systems Landfill, Inc. (TDSL). The Gregorys chose to make TDSL a cash-method taxpayer when they incorporated it. TDSL was successful, and the Gregorys began sifting through the Code to find more deductions. With the help of their accountant they discovered section 468.[2] Section 468 lets taxpayers who own landfills deduct now a portion of what it will cost to clean them up in the future--even if that future is many years away. Sec. 468(a)(1). A current deduction for a future expense is a good deal for most

_____

[2] Unless we say otherwise, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

taxpayers, and the disagreement between the parties here is simple--who counts as a "taxpayer" under section 468? The Gregorys think a "taxpayer" means *any* taxpayer, including cash-method taxpayers like TDSL. But the Commissioner thinks it means only taxpayers who use the accrual method.

We must answer this novel question.

## Background

I.    TDSL and Its Accounting

TDSL is an S corporation for income-tax purposes.[3] TDSL is also a closely held family business. Bob Gregory incorporated the business in 1988, and ownership during the years in issue was split among Bob and three other family members. Bob and his wife Kay owned 80% of the company, and Bob's brother,

---

[3] S corporations are corporations whose taxation is governed by subchapter S of the Code. S corporations generally don't pay federal income tax but are, like partnerships, passthrough entities that channel income and deductions to their owners. See Gitlitz v. Commissioner, 531 U.S. 206, 209 (2001) ("Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation"). So when we say the Gregorys claimed a deduction, technically, we are saying that TDSL reported a deduction on its return and the deduction flowed through to the Gregorys to claim on their returns. See sec. 1.1366-1(a), Income Tax Regs.; see also Hill v. Commissioner, T.C. Memo. 2010-268, slip op. at 11 ("[A]n S corporation's items of income, gain, loss, deduction, and credit--whether or not distributed--flow through to the shareholders, who must report their pro rata shares of such items on their individual income tax returns for the shareholder taxable year within which the S corporation's taxable year ends").

Jim Gregory, Jr., and his wife Janet owned the remaining 20%. Bob and Jim serve as TDSL's directors and are responsible for choosing TDSL's method of accounting.

A few years after it was incorporated, TDSL started operating a solid-waste disposal facility--a fancy way of saying the company puts trash in a landfill. But this landfill is not a dump--it is big, and it is up-to-date. When it opened in 1991 on 730 acres outside of Creedmoor, Texas, just south of Austin, TDSL's was the state's first fully integrated-service landfill. It also recovers resources from its solid-waste disposal, compost production, and recycling. It currently processes anywhere between 2,000 and 3,000 tons of solid waste each *day*. No matter how modern TDSL's facility is, though, there will come a day when it will close and closing a landfill means having to comply with a great many environmental regulations--federal, state, and local. The Texas Commission on Environmental Quality knows how expensive it can be to clean up and restore a site after a landfill closes, and that agency therefore requires waste-disposal companies such as TDSL to keep a standby letter of credit. These letters of credit are designed to ensure companies don't pile up trash in landfills and then go out of business

without cleaning up after themselves.[4] By the end of 2009 TDSL's letter of credit had grown to a little more than $2 million.

TDSL did not at first claim any deductions for its estimated clean-up costs. But in 1996 TDSL's then CEO asked an outside accountant to look into whether TDSL was eligible to currently deduct these costs under section 468. The accountant advised TDSL that it was eligible, and TDSL made the election and claimed the section 468 deduction for the first time on its 1996 tax return. On its 2008 return, TDSL took a slightly more than $100,000 deduction for estimated clean-up costs; and on its 2009 return, a slightly smaller one. TDSL hadn't actually paid those clean-up costs yet--it simply estimated the costs; and it also hadn't charged the estimated costs against its letter of credit yet either. TDSL also did not just make the numbers up--it hired a professional engineering service to estimate the correct amount. The Gregorys probably thought this meant any controversy about the deduction was safely buried. For years the Commissioner didn't say anything.

But that was soon to change.

---

[4] Section 468 refers to these costs as reclamation and closing costs, but this definition simply means clean-up costs.

II.     The Notices of Deficiency

In April 2013 the Commissioner sent the Gregorys notices of deficiency for their 2008 and 2009 tax years that disallowed these deductions because TDSL is a cash-method taxpayer. Excluding cash-method taxpayers from the benefits of section 468 is not an obvious conclusion: Section 468 says that a "taxpayer" may currently deduct clean-up costs for landfills. Sec. 468(a). The Commissioner says, however, that in context a "taxpayer" really means "a taxpayer who uses the accrual method." TDSL does use the accrual method to prepare its financial statements, but it has always used the cash method for tax-accounting purposes, and no one doubts that this means it should not have claimed a section 468 deduction if that section's benefits depend on whether a taxpayer uses the accrual method. The notices of deficiency determined that without those section 468 deductions, the Gregorys' taxable income was substantially higher.

The Gregorys, residents of Texas when they filed timely petitions with us, argue that when section 468 says "taxpayer" it means all taxpayers, regardless of what method of tax accounting they use. The parties have stipulated the facts and submitted these cases for decision under Rule 122 as a nearly pure issue of law. There is no dispute that TDSL is entitled to keep its accounting books on the accrual method and its tax books on the cash method. And there is no dispute

about the amounts of TDSL's deductions--the only dispute is whether it was entitled to the deductions at all.

## Discussion

I.     Landfill Accounting

Most taxpayers are free to choose the cash method, although large C corporations, partnerships, and tax shelters cannot. Sec. 448(a). Cash-method taxpayers report income for the tax year in which they actually or constructively receive it. See sec. 1.446-1(c)(1)(i), Income Tax Regs. Cash-method taxpayers also generally deduct an expense for the tax year in which they pay it. See sec. 1.461-1(a)(1), Income Tax Regs. A cash-method taxpayer may also deduct the noncash expenses of depreciation, depletion, and losses. Id. The method is fairly simple, which is why many taxpayers choose it.

The accrual method is more complicated. Accrual-method taxpayers must generally report their income for the year in which it is earned and deduct expenses for the year in which they are incurred. See sec. 461(a); sec. 1.461-1(a)(2)(i), Income Tax Regs.; see also sec. 451; sec. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs. Section 461 gives them the general rules too. An expense is incurred under the "all events test." Sec. 1.461-1(a)(2), Income Tax Regs.; see also sec. 461(h)(1), (4). The all-events test has three requirements: (1) there must

be a liability; (2) the amount of the liability can be determined with reasonable accuracy; and (3) there has been economic performance. Sec. 461(h); sec. 1.461-1(a)(2), Income Tax Regs. Accrual-method taxpayers cannot deduct an expense until all three requirements are met. Sec. 1.461-1(a)(2), Income Tax Regs. This ensures that income and expenses are matched to the correct year. The regulations make clear that a taxpayer such as TDSL is free to use one method for tax purposes and the other method for financial accounting purposes. Sec. 1.446-1(a)(1), Income Tax Regs.

II.    Text

This is all a backdrop for the key question in these cases: What does "taxpayer" mean in section 468? We start with the words of the section, read in the context of the statute as a whole. Wright v. Ford Motor Co., 508 F.3d 263, 269 (5th Cir. 2007).[5] The Fifth Circuit follows the usual rules: If the statute is plain and unambiguous, we stop. United States v. Shabazz, 633 F.3d 342, 345 (5th Cir. 2011). We assume the statute was written as Congress intended. Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). It is the text, not the legislative history, that is the most reliable indicator of Congress's intent.

---

[5] Because the Gregorys were residents of Texas when they filed their petitions, these cases are appealable to the Court of Appeals for the Fifth Circuit unless the parties agree otherwise. See sec. 7482(b)(1)(A).

Marques v. Lynch, 834 F.3d 549, 553 (5th Cir. 2016); Martinez v. Mukasey, 519 F.3d 532, 543 (5th Cir. 2008). If there is ambiguity and it's necessary to resort to legislative history, we do so with caution. Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps., 286 F.3d 803, 805 (5th Cir. 2002); Boureslan v. Aramco, 857 F.2d 1014, 1018 (5th Cir. 1988).

Section 468(a)(1) provides: "[I]f a *taxpayer* elects the application of this section with respect to any mining or solid-waste disposal property, the amount of any deduction for qualified reclamation or closing costs for any taxable year to which such election applies" shall equal the current reclamation or closing costs allocable to that year. Sec. 468(a)(1) (emphasis added). Section 468 doesn't limit the election to accrual-method taxpayers--which even the Commissioner acknowledges.[6] The section just tells a "taxpayer" who makes a section 468 election how to calculate the deduction.

Even though section 468 doesn't define "taxpayer", we are not left without textual help. The Code has a small dictionary toward its end, and in it we find a default definition of "taxpayer". Sec. 7701(a)(14); see, e.g., Rothkamm v. United States, 802 F.3d 699, 704 (5th Cir. 2015). It says:

---

[6] Although it was enacted in 1984, the Secretary hasn't yet issued any regulations for section 468. He also hasn't issued any other guidance to interpret section 468 or analyze whether it applies to cash-method taxpayers.

SEC. 7701(a). When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof--

(1) Person.--The term "person" shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation.

\* \* \* \* \* \* \*

(14) Taxpayer.--The term "taxpayer" means any person subject to any internal revenue tax.

The definition of *taxpayer* is simple, broad, and does not distinguish entities that use the accrual method from those that use the cash method. The question is whether the person--which includes corporations like TDSL--is "subject to any internal revenue tax." TDSL is a corporation and like other S corporations it is required to pay Social Security and unemployment (albeit not income) taxes.[7] Sec. 6037(a); Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 134 (2002) (finding that an S corporation owed employment taxes), aff'd, 93 F. App'x 473 (3d Cir. 2004). So TDSL is a "taxpayer".

---

[7] See Fehlhaber v. Commissioner, 94 T.C. 863, 868 (1990) ("as a passthrough entity, an S corporation is generally a taxpayer not subject to income tax. Secs. 1363(a) and 7701(a)(14)."), aff'd, 954 F.2d 653 (11th Cir. 1992); but see Rollercade, Inc. v. Commissioner, 97 T.C. 113, 118 (1991) (S corporation not "taxpayer" in deciding on whom to impose sanctions under section 6673). Our Opinion today reaches only the question of whether an S corporation is a taxpayer for the purposes of section 468. We are not deciding whether an S corporation is a taxpayer for every section of the Code.

Of course this is tax, so there's a possible loophole. The default definition doesn't apply if section 468 "distinctly express[es]" a different definition of taxpayer. Sec. 7701(a); see, e.g., Rothkamm, 802 F.3d at 708 (finding that nothing in the section at issue "specifically express[ed]" a limited definition of "taxpayer" or was "manifestly incompatible" with the definition of section 7701(a)). But we see no loophole here: Section 468 has no definition of "taxpayer". There's nothing in section 468 "manifestly incompatible" with the default definition either. Section 468 simply says a "taxpayer". There's also nothing "manifestly incompatible" with a taxpayer's currently deducting clean-up costs--that's what section 468 is all about.

"Taxpayer" is one of the most basic terms in the Code. It is also one that Congress itself knows how to modify as context requires.[8] Congress could have-- as it has on numerous occasions--said "accrual method taxpayer," but it chose in

---

[8] See, e.g., sec. 461(b) ("[i]n the case of the death of a taxpayer whose taxable income is computed under an accrual method of accounting"); sec. 461(d) ("[i]n the case of a taxpayer whose income is computed under an accrual method of accounting"); sec. 458(a) ("[a] taxpayer who is on the accrual method of accounting may elect"); sec. 271(c) ("[i]n the case of a taxpayer who uses an accrual method of accounting"); sec. 263A(d)(1)(B) ("[s]ubparagraph (A) shall not apply to any corporation * * * required to use an accrual method of accounting"); sec. 108(e)(7)(B) ("[i]n the case of any creditor who computes his taxable income under the cash receipts and disbursements method"); sec. 163(e)(2)(C) ("[i]n the case of an obligor of a short-term obligation * * * who uses the cash receipts and disbursement method of accounting").

section 468 to say "taxpayer" instead. It's difficult to believe that Congress forgot to modify such a basic term, and really meant "accrual method taxpayer," when it actually said "taxpayer".

We could stop there, with a holding that the language of section 468 is unambiguous. But the Commissioner has piled up a number of contextual counterarguments. He first points us to section 461, which lists several exceptions to the general pay-before-deduct rule for cash-method taxpayers, and section 468 is not one of them. The section 461 regulations echo this. They say cash-method taxpayers can deduct some expenses before the expenses are paid, "*such as* * * * for depreciation, depletion, and losses under sections 167, 611, and 165, respectively.*" See sec. 1.461-1(a)(1), Income Tax Regs. (emphasis added). Section 468 isn't on this list either. The Commissioner says that implies section 468 was not meant as an exception to the general pay-before-deduct rule.

The problem here is that the regulation's list is prefaced with the phrase "such as." This phrase is important. It signals that what follows are examples, not an exclusive list. The Code and regulations are full of similar lists. Section 1.170A-2(a)(3), Income Tax Regs., discusses holidays when schools are closed, "such as Christmas and Easter." Schools are obviously closed for holidays other than Christmas and Easter. Other regulations follow a similar pattern. To deduct

business expenses, taxpayers must have documents "such as receipts, paid bills, *or similar evidence*" showing their expenses. Sec. 1.274-5A(c)(2)(iii), Income Tax Regs. (emphasis added). The phrase "or similar evidence" indicates that "such as" means for example, and the list isn't comprehensive. The Commissioner hasn't provided any evidence that the list in section 1.461-1(a), Income Tax Regs., was meant to be an exclusive list of exceptions, and we've found none. This isn't a winning argument.

The Commissioner next argues that the term "incurred" in section 468--which he says is usually used in the context of the accrual method--shows that section 468 was meant to apply only to accrual-method taxpayers. Section 468 uses the term "incurred" twice. Mining reclamation and closing costs are defined as "[a]ny expenses incurred for any land reclamation or closing activity which is conducted in accordance with a reclamation plan." Sec. 468(d)(2)(A). Similarly, solid-waste disposal and closing costs are defined as "[a]ny expense incurred for any land reclamation or closing activity in connection with any solid-waste disposal site." Sec. 468(d)(2)(B).

We agree with the Commissioner that "incurred" often refers to an expense that is deductible under the accrual method while the word "paid" often refers to an expense that is deductible under the cash method. Section 162--one of the most

commonly cited Code sections--combines the two by allowing deductions for ordinary and necessary expenses "paid or incurred" in a trade or business. Sec. 162(a). The Supreme Court itself has said "incurred" in this context refers to the accrual method. United States v. Hughes Props., Inc., 476 U.S. 593, 599 (1986) ("An accrual-method taxpayer is entitled to deduct an expense in the year in which it is 'incurred,' [sec.] 162(a), regardless of when it is actually paid"). The Court cited sections 1.446-1(c)(1)(ii), 1.451-1(a), and 1.461-1(a)(2), Income Tax Regs., all of which are regulations that determine when an expense is incurred, and all of which govern taxpayers who use the accrual method.[9] The Court also noted that the term "paid" in section 162 refers to the cash method. Id. at 599-600 ("Under the 'cash receipts and disbursements method,' * * * a taxpayer is entitled to deduct business expenses only in the year in which they are paid").[10]

---

[9] The Supreme Court in United States v. Hughes Props., Inc., 476 U.S. 593, 600 (1986) ("1.451-1(a) (accrual of income)"), specifically noted that it was referring to the portion of sec. 1.451-1(a), Income Tax Regs., that applied to the accrual method, not the cash method.

[10] Other regulations reinforce the point. For example, the regulations for the annualized income-installment method say cash-method taxpayers can't take deductions until expenses are "paid" and accrual-method taxpayers can't take deductions until expenses are "incurred". Sec. 1.6655-2(f)(1)(ii), Income Tax Regs.

There's a problem, though, with the Commissioner's argument that "incurred" is a subtle signal that "taxpayer" in section 468 must mean "accrual method taxpayer"--section 468 also uses the term "paid" four times. The section says:

> (C) Reserve to be charged for amounts *paid*.--Any amount *paid* by the taxpayer during any taxable year for qualified reclamation or closing costs allocable to portions of the reserve property for which the election under paragraph (1) was in effect shall be charged to the appropriate reserve as of the close of the taxable year.
>
> \* \* \* \* \* \* \*
>
> (3) Allowance of deduction for excess amounts *paid*.--There shall be allowed as a deduction for any taxable year the excess of--
>
> (A) the amounts described in paragraph (2)(C) *paid* during such taxable year, over
>
> (B) the closing balance of the reserve for such taxable year (determined without regard to paragraph (2)(C)).

Sec. 468(a)(2)(C), (3)(A) and (B) (emphasis added). Section 468 uses terms that signal its application to both accrual- and cash-accounting. Reading "taxpayer" in section 468 to mean "all taxpayers"--even if this creates a current deduction for a future expense--just means that this section creates another exception to a general

rule for cash-method taxpayers.[11]  The Code and regulations are filled with general rules and exceptions to them.  So this argument doesn't help the Commissioner either.

The Commissioner next fires off another canon of interpretation--*noscitur a sociis*.  *Noscitur a sociis* is a Latin phrase that means "it is known by its associates."[12]  Black's Law Dictionary 1087 (8th ed. 2004).  The Commissioner's invocation of this doctrine essentially repeats his argument that "incurred" signals that section 468 applies only to accrual-method taxpayers.  We already addressed this--section 468 also uses the term "paid", which the Commissioner concedes typically applies to cash-method taxpayers.  As they say at the IRS: *Ab his sociis publicanus non adjuvatur*.

The Commissioner has also found some cases that at least mention section 468.  In South Side Landfill, Inc. v. United States, 52 F. Supp. 2d 783, 784 (W.D.

---

[11] Nothing too strange here--some accrual-method taxpayers, for example, are required to use the cash method to determine how much of their state-tax bill they can deduct.  Sec. 1.164-1(a)(5), Income Tax Regs.

[12] In The Tempest Gonzalo says he would not have "[t]reason, felony, sword, pike, knife, gun, or need of any engine."  William Shakespeare, The Tempest, act 2, sc. 1.  The list "provides a helpful context for the meaning of engine, which today is considered a broad term with an entirely neutral meaning."  Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal Text 195 (2012).

Mich. 1999), the court described section 468 as allowing "landfill operators who use the accrual-method of accounting" to deduct clean-up costs before the costs are actually incurred. But the court there was not deciding whether section 468 could also apply to cash-method taxpayers, and it didn't analyze the issue. It was deciding only the much narrower issue of whether section 468(a)(2)(B) applies to landfill owners who take deductions and actually set aside funds for future closing obligations. Id. at 784. The taxpayers in South Side Landfill were accrual-method taxpayers, so it's not surprising the court described section 468 in that context, and does not narrow the Code's broad definition of taxpayer.

The Commissioner also cites the principle of *ejusdem generis*--a fancy way of saying that "[w]here general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Text 199 (2012). But section 468 doesn't have a list--it just says "taxpayer". Without a *generis*, there is no *ejusdem* and this canon likewise cannot help us.

The Commissioner's final textual argument is that sections 468 and 468A have similar language, and since section 468A applies only to accrual-method taxpayers, section 468 must as well. Sections 468 and 468A are indeed very

similar--both allow taxpayers to deduct clean-up costs, both impose reserve requirements, and both have the same general structure. Section 468A allows an electing "taxpayer" to deduct portions of nuclear decommissioning costs. Sec. 468A(a) and (b). Section 468A says:

> SEC. 468A(a). In General.--If the *taxpayer* elects the application of this section, there shall be allowed as a deduction for any taxable year the amount of payments made by the taxpayer to a Nuclear Decommissioning Reserve Fund * * * during such taxable year. [Emphasis added.]

The Commissioner thinks section 468A applies only to accrual-method taxpayers because of section 1.461-1(a)(2)(iii)(B) of the regulations. But that regulation-- which also applies to section 468--doesn't say that. It says only that accrual-method taxpayers who make an election under sections 468 or 468A must account for liabilities under those Code sections, and not the general rules for accrual-method taxpayers under section 461 and its regulations. Sec. 1.461-1(a)(2)(iii)(B), Income Tax Regs. The regulation does not say sections 468 and 468A apply only to accrual-method taxpayers.

Section 1.468A-1(a), Income Tax Regs., also says that any "eligible taxpayer" may elect to claim a deduction under section 468A. Sec. 1.468A-1(a), Income Tax Regs. Paragraph (b)(1) defines eligible taxpayer as "*any* taxpayer that possesses a qualifying interest in a nuclear power plant." (Emphasis added.) This

*is* an example of a section that provides a more specific definition of "taxpayer", but the definition does not limit the application of the section to particular entities based on their accounting method; it limits the section's application to entities with a qualifying interest in a nuclear power plant.

III. Legislative History and Policy

We think all this should be enough, but the parties discuss what legislative history there is and make some policy arguments too. The Commissioner urges us to use legislative history to define "taxpayer" because, he argues, the term must be ambiguous if we need to jump from section 468 to section 7701 to define it. That's flat out wrong. There are many cases where courts have used section 7701(a)(14) to define the term "taxpayer" without concluding this made the Code ambiguous enough to resort to legislative history. See, e.g., United States v. Williams, 514 U.S. 527, 535 (1995); Rothkamm, 802 F.3d at 708 ("Because the statute is clear, we must conclude that the section 7701(a)(14) definition of 'taxpayer' applies"). The definitions in section 7701 bring clarity to the Code, not ambiguity.

We will nevertheless--out of a supersized abundance of caution--look at the legislative history anyway. That history begins with the Commissioner's original position on clean-up costs--that they couldn't be deducted even by an accrual-

method taxpayer until they were actually paid. Ohio River Collieries Co. v. Commissioner, 77 T.C. 1369, 1375 (1981) (citing Rev. Rul. 72-34, 1972-1 C.B. 132), changed all that. We held there that clean-up costs accrue when these costs can be estimated with reasonable accuracy. Id. at 1372. Congress partially codified this holding in section 461(h) as part of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 91, 98 Stat. at 598. But that Act also added a third requirement to the all-events test for accrual-method taxpayers generally-- economic performance would have to take place before a liability would be considered "incurred". See United States v. General Dynamics Corp., 481 U.S. 239, 243 n.3 (1987). That Act also added section 468 to the Code. The Commissioner thinks the legislative history for the Act shows that "taxpayer" in section 468 must mean a taxpayer who uses the accrual method.

His argument relies heavily on the Blue Book. See Staff of J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 260 (J. Comm. Print 1985). Blue Books are compiled by the Joint Committee on Taxation and provide commentary on tax laws after Congress enacts them. They "therefore d[o] not inform the decisions of the members of Congress who vot[e] in favor of the [law]." United States v. Woods, 571 U.S. ___, ___, 134 S. Ct. 557, 568 (2013) (quoting Flood v. United States, 33 F.3d 1174,

1178 (9th Cir. 1994)). The Supreme Court has told us such "[p]ost-enactment legislative history [a contradiction in terms] is not a legitimate tool of statutory interpretation." Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011). Instead, like law review articles, persuasive Blue Books may be helpful. Woods, 571 U.S. at __, 134 S. Ct. at 568.

The Blue Book does tell us that Congress passed section 461(h) to ensure that accrual-method taxpayers take deductions only when they economically incur expenses. Staff of J. Comm. on Taxation, supra, at 260.[13] As a general rule Congress didn't want taxpayers to be able to deduct expenses that hadn't been incurred yet, because any other rule would overstate the economic impact of those expenses on the current income of an accrual-method taxpayer when one considers the time value of money. Id. Section 468 was to be an exception to this general rule for reclamation and closing costs. Id. at 273.

Before section 468 was enacted, companies used different accounting methods to track clean-up costs. DEFRA authorized taxpayers to use a uniform

---

[13] In this it echoed the conference committee's description of the original House bill. H.R. Conf. Rept. No. 98-861, at 879 (1984), 1984-3 C.B. (Vol. 2) 1, 133. The conference committee report shows that the Senate's amendment--with its use of the more general term "taxpayer"--is what ended up in the final text of the statute. There is nothing in that committee report that suggests a limit on the meaning of "taxpayer" depends on the accounting system used. Id. at 879-82, 1984-3 C.B. (Vol. 2) at 133-36.

method of accounting for reclamation and closing costs even before economic performance.  Id. at 273.  This history does show that Congress wanted a more liberal rule for the deductibility of reclamation and closing costs.  Id.

The Gregorys join this detour through section 468's legislative history, but look at it in a broader context.  They argue that to see a true picture of Congress's intent we need to zoom out and look at history from 1982 as well.  In that year Congress considered several bills that would have allowed both cash- and accrual-method taxpayers to deduct estimated clean-up costs for surface mining before the work was actually performed.  Mining Reclamation Reserve Bills:  Hearing Before the Subcommittee on Energy and Agricultural Taxation of the Committee on Finance of U.S. Senate 97th Cong. 1 (1982).  They argue from this that Congress wanted cash-method taxpayers to benefit from the bills.  Congressman Bailey explained to the subcommittee that the bills would allow cash-method taxpayers to elect the accrual method for reclamation costs and to deduct reclamation reserves. Id. at 27.  They say that Congress was looking to give both types of taxpayers flexibility.  Id. at 28.  The explanation of the bills makes this even more clear. Under S. 1911 and S. 2642, cash-method taxpayers "would be allowed to use the accrual method [and that would be the pre-1984 accrual method] for reclamation costs."  Id. at 7.  This bit of legislative history--admittedly legislative history of

bills the relevant provisions of which weren't enacted until the next Congress-- uses the term "accrued reclamation expenses," but they would have applied to cash-method taxpayers. Id. Then, when the 1982 statute was marked up and enacted in 1984, the phrase "accrued reclamation expenses" had morphed into "qualified reclamation expenses" and "qualified closing costs." One can see from this that the unfinished 1982 legislation, with its perhaps awkward phrasing about allowing cash-method taxpayers "to use the accrual method," aimed to help both cash- and accrual-method taxpayers. A reasonable inference is that the enacted 1984 statute was a cleaner way of achieving the same end. But one can definitely see how this would be an instance--were we in the era before textualism again became the predominant mode of statutory interpretation--where we'd have to conclude that ambiguities in the legislative history make it "clear that we must look primarily to the statutes themselves to find the legislative intent." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 412 n.29 (1971).

The parties move on in their arguments from legislative history to tax policy, and we hesitate to follow, but we will address the Commissioner's final argument--that the Gregorys' position would lead to absurd results. The Commissioner thinks that letting cash-method taxpayers claim deductions under section 468 would lead to double deductions for the same expenses--once now and

then again when clean-up actually begins later on. His concern isn't realistic. If a taxpayer elects to claim deductions under section 468, its liability is computed under that section, and it gets no deduction for current clean-up expenses until it exhausts its accumulated reserve for those costs. Sec. 468(a)(3).

Taxpayers like TDSL must comply with numerous environmental-protection laws at the federal, state, and local levels. These costs can be large, and they continue after a landfill, mine, or nuclear-power plant stops earning income. Section 468 lessens the burden of compliance by helping to match income and expenses better in an era where businesses that are messy to run must clean up after themselves and maintain proof that they have the means to do so.

## Conclusion

The term "taxpayer" in section 468 includes cash-method taxpayers like TDSL. Since section 468 itself doesn't define the term, we hold that the general definition under section 7701(a)(14) applies. TDSL is eligible to currently deduct

its estimated clean-up costs under section 468, and the Gregorys may claim those deductions on their returns.

Decisions will be entered for

petitioners.

Reviewed by the Court

FOLEY, VASQUEZ, THORNTON, GOEKE, GUSTAFSON, PARIS, MORRISON, KERRIGAN, BUCH, and PUGH, JJ., agree with this opinion of the Court.

LAUBER, J., concurring: I agree with the result the Court reaches today, but I do so with some reluctance. The legislative history convinces me that Congress likely intended that the election to set up reserves for mining and waste site reclamation costs (collectively, reclamation costs) would be available only to accrual basis taxpayers. However, quite possibly because of a last-minute drafting glitch, Congress did not reify this intent in the text of section 468 as actually enacted. If the Secretary, in reliance on the legislative history, had issued regulations that defined "taxpayer" for purposes of section 468 to mean "accrual basis taxpayer," the outcome might have been different. Cf. Lindsay Manor Nursing Home, Inc. v. Commissioner, 148 T.C. __ (Mar. 23, 2017) (sustaining the Secretary's regulations excluding taxpayers other than individuals from the definition of "taxpayers" eligible for levy relief on account of "economic hardship" under section 6343(a)(1)(D)). But the Secretary has issued no such regulations, and I cannot conclude that the Court's plain language construction of the statute produces an absurd result.

As the Court notes, sections 468 and 468A entered the Code, hand in glove with section 461(h), as part of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 91, 98 Stat. at 598-606. But there is more by way of legislative background to these provisions than the post-enactment Blue Book that the

Court discusses.  See op. Ct. p. 20 (citing Staff of J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 258-276 (J. Comm. Print 1985)).  By enacting section 461(h) as part of DEFRA, Congress added a new prong--"economic performance"--to the judicially created "all events test" for determining the year for which accrual basis taxpayers may deduct business expenses under section 162.  See United States v. General Dynamics Corp., 481 U.S. 239, 242 (1987); United States v. Anderson, 269 U.S. 422 (1926); sec. 1.461-1(a)(2), Income Tax Regs.

In a report accompanying an amendment to the original House bill, H.R. 4170, 98th Cong. (1984), the Ways and Means Committee described proposed section 461(h) as a provision aimed at preventing "premature accruals."  As it explained:  "[T]he rules relating to the time for accrual of a deduction by a taxpayer using the accrual method of accounting should be changed to take into account the time value of money."  H.R. Rept. No. 98-432 (Part 2), at 1046, 1254 (1984), 1984 U.S.C.C.A.N. 697, 917.  But despite its reference to "the time value of money," the committee did not propose a discounting regime, recognizing that "determining the discounted values for all kinds of future expenses would be extraordinarily complex and would be extremely difficult to administer."  Ibid.  Instead, by requiring that expenses be accrued only when economic performance has occurred, the

committee aimed to "prevent deductions for future expenses in excess of their true cost while avoiding the complexity of a system of discounted valuation." Id. at 1255, 1984 U.S.C.C.A.N. at 917.

It seems clear that section 461(h) as proposed was envisioned as applying only to accrual basis taxpayers, with no relevance or implications for cash basis taxpayers. And section 461(h) as enacted applies only to accrual basis taxpayers. It imposes an "economic performance" requirement for "determining whether an amount has been incurred with respect to any item during any taxable year." Sec. 461(h)(1) (emphasis added). And it explicitly adds this economic performance requirement as a statutory modification to "the all events test," which applies exclusively to accrual basis taxpayers.

Notably, the House bill did not carve out an exception from the "economic performance" requirement for estimated future reclamation costs or nuclear decommissioning costs.[1] To the contrary, as an example of how the economic performance test would apply to the former, the House report stated as follows: "[I]f a strip mining company engages a contractor to reclaim stripped land, economic

---

[1] The House bill did contain an exemption from the "economic performance" requirement for "[a]ny other provisions of this title which specifically provide[] for a deduction for a reserve for estimated expenses." See H.R. Rept. No. 98-432 (Part 2), at 1256 (1984), 1984 U.S.C.C.A.N. 697, 918.

performance occurs when the contractor performs the reclamation rather than when the strip mining company enters into a binding contract with the contractor." H.R. Rept. No. 98-432 (Part 2), supra at 1255, 1984 U.S.C.C.A.N. at 918. Similarly, "when the strip mining company itself reclaims the land, economic performance occurs when the land is reclaimed." Ibid. The House bill would thus have denied accrual basis taxpayers any deduction for reclamation or nuclear decommissioning costs before the year in which "economic performance" had occurred.

The Senate was apparently more solicitous of accrual basis taxpayers subject to clean-up cost obligations mandated by Federal or State law. The Senate bill that eventually became that chamber's amendment to H.R. 4170 proposed to include in section 461, immediately after new subsection (h), two additional new subsections (i) and (j), each constituting an exception from the former's "economic performance" requirement. Each of the latter provisions was denominated a "Special Rule." See S. Prt. 98-169 (Vol. II), at 207, 212 (1984).

Proposed section 461(i) provided an elective method whereby taxpayers could deduct contributions to a reserve created to pay future nuclear decommissioning costs. A report accompanying the Senate Finance Committee's mark-up of that bill characterized that provision as "the exclusive method for obtaining a deduction for nuclear decommissioning expenses prior to economic performance."

S. Prt. 98-169 (Vol. I), at 277.  In parallel fashion, proposed section 461(j) provided an elective method whereby taxpayers could deduct contributions to a reserve created to pay future reclamation costs.  The Senate Finance Committee report explained that this method "departs from the general principle, adopted in the bill, of allowing a deduction for future liabilities only when economic performance occurs."  Id. at 274.

Envisaged as exceptions to the general "economic performance" rule of section 461(h), subsections (i) and (j) in the Senate bill were clearly aimed at accrual basis taxpayers.  Their placement immediately after subsection (h), as "special rules" limiting its application in specified circumstances, underscores this legislative design.  It follows that, under the Senate bill, cash basis taxpayers would have been ineligible for either elective regime.

Following a conference between the House and the Senate, the conferees produced a report, H.R. Conf. Rept. No. 98-861 (1984), 1984 U.S.C.C.A.N. 1445.  Incorporating the amendments in that conference report, H.R. 4170 was enacted into law as DEFRA.  As the conference report explained, "the conference agreement generally follows the House bill" in attacking premature accruals by adding the "economic performance" test of section 461(h).  Id. at 873, 1984 U.S.C.C.A.N. at 1561.  But the conferees adopted several "modifications" to the

original House bill, including "the Senate amendment's provisions relating to nuclear power plant decommissioning costs and to costs associated with the reclamation and closing of mine and solid waste disposal sites." Ibid. In other words, the conference agreement adhered to the approach of the Senate amendment by adopting elective exceptions that allowed accrual basis taxpayers to accrue deductions for future reclamation and nuclear decommissioning costs in advance of "economic performance."

The conference report's discussion of these elective clean-up cost provisions tracks that of the Senate report. This suggests that the conferees, like the Senate Finance Committee, regarded these provisions as exceptions from the economic performance requirement that would otherwise bind accrual basis taxpayers. Indeed, the conference report says this in so many words, noting that the conference agreement followed the Senate amendment by "except[ing] nuclear decommissioning costs from the general rule * * * of allowing accrual basis taxpayers to deduct future liabilities only when economic performance occurs." Id. at 877, 1984 U.S.C.C.A.N. at 1561.

Similarly, in discussing the exception for future reclamation costs, the conference report noted the IRS' longstanding litigation position that "reclamation expenses cannot be accrued until reclamation occurs." Id. at 879, 1984

U.S.C.C.A.N. at 1567. The conference report then cited with approval <u>Ohio River Collieries Co. v. Commissione</u>r, 77 T.C. 1369 (1981), where this Court had held that an accrual basis strip mining company could accrue deductions for expected future reclamation costs if those costs were "susceptible of reasonable estimation" under the all events test. <u>Id.</u> at 1377. Reading this case citation in context, it appears that the conferees intended, as the Senate Finance Committee had intended, to give similarly situated accrual basis taxpayers the ability to "elect into" the outcome of <u>Ohio River Collieries</u>, notwithstanding the economic performance requirement being imposed by new section 461(h). <u>Compare</u> S. Prt. 98-169 (Vol. I), <u>supra</u> at 274, <u>with</u> H.R. Conf. Rept. No. 98-861, <u>supra</u> at 879.

In short, the explanatory remarks of the conference committee strongly suggest that Congress intended to adopt the Senate approach, whereby the two elective clean-up cost provisions would constitute exceptions to the "economic performance" requirement for accrual basis taxpayers and be exclusively applicable to them. But the explanatory remarks of the conferees do not have the force of law. <u>See Roeder v. Islamic Republic of Iran</u>, 333 F.3d 228, 236-237 (D.C. Cir. 2003). And the text that Congress actually enacted differs from that of the Senate amendment in one important respect.

For reasons that are nowhere explained, the conferees moved the two elective clean-up cost provisions from their original location in the Senate amendment, where they appeared as proposed subsections (i) and (j) of section 461. Instead, the conferees placed these provisions into a pair of new stand-alone Code sections. The reclamation cost provision became section 468, and the nuclear decommissioning cost provision became section 468A.[2] As a result of this shift, the term "taxpayer" in section 468 became unmoored from its original section 461 context, rendering respondent's position that "taxpayer" means "accrual basis taxpayer" correspondingly more difficult to sustain.

The conferees did not explain why the two elective clean-up cost provisions were relocated. Indeed, the conferees did not even mention that they had made this change. It is difficult to tell what significance we should attach to this "dog that didn't bark." Compare Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 63 (2004), with id. at 73-74 (Scalia, J., dissenting) (expressing doubt about the "Canon of Canine Silence" as a tool of statutory construction).

_____

[2]The conferees retained the House bill's exemption from the "economic performance" requirement for other Code provisions that "specifically provide[] for a deduction for a reserve for estimated expenses." See supra note 1. That exemption, which now appears as section 461(h)(5), evidently serves as a cross-reference to (among other provisions) sections 468 and 468A.

"[T]he meaning of statutory language, plain or not, depends on context." King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991).  That contextual analysis may encompass the statutory provision's styling and location.  See Smith v. Doe, 538 U.S. 84, 85 (2003) ("formal attributes of a legislative enactment, such as the manner of its codification * * *, are probative of the legislature's intent"); see also FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (emphasizing the importance of reading a statute's words "with a view to their place in the overall statutory scheme").  As enacted in sections 468 and 468A, the two elective clean-up cost provisions are captioned "special rules," as was true in the Senate amendment.  But because these two regimes are now located outside section 461, that term no longer automatically connotes special rules for accrual basis taxpayers.

In sum, section 468 as enacted is untethered from the economic performance requirement imposed on accrual basis taxpayers by section 461(h).  As a result, the contextual enterprise of determining whether cash basis taxpayers are excluded from the ambit of section 468 ultimately reduces to a textual analysis.  And in that endeavor I cannot fault the Court.  It reasonably concludes that nothing in the text of section 468 necessitates giving the term "taxpayer" a meaning less comprehensive than the ordinary meaning it has elsewhere in the Code.

This conclusion does seem misaligned with the evolution of the legislative proposals that culminated in the enactment of sections 468 and 468A. Conceivably this misalignment may reflect a drafting oversight. When relocating the two elective clean-up cost provisions, the conferees may not have realized that the term "taxpayer," as it appeared the Senate's proposed sections 461(i) and (j), required a corollary modification. If the Secretary believed that this created a statutory gap, he might have issued regulations in an effort to fill it. But in the absence of regulations "we must apply the statute as we find it." McClain v. Commissioner, 311 U.S. 527, 530 (1941).

MARVEL, GALE, NEGA, and ASHFORD, JJ., agree with this concurring opinion.